**Application of FLORIDA WATER SERVICE, Inc.**
Nos. 6426-W, 6427-W and 6428-S.

Railroad & Public Utilities Commission.

August 17, 1962.

H. Barrow Cagle, Miami, for applicant.

Robert M. Ervin and Wilfred C. Varn of Ervin, Pennington & Varn, Tallahassee, for Town of Lake Clarke Shores and Keller Corporation, protestants.

James Hughes, president, Seminole Manor Civic Association, for the association, protestant.

Chairman WILBUR C. KING, Commissioners JERRY W. CARTER and EDWIN L. MASON conducted hearings in this matter in Tallahassee on January 18 and March 7, 1962.

BY THE COMMISSION.

At the close of the final hearing the commission allowed briefs to be concurrently filed by the parties within a fixed time and briefs were filed on behalf of both the applicants and the pro-testants. Having considered these and the entire record, the commission now enters its order in the premises.

By its applications in these dockets Florida Water Service, Inc., seeks increases in the rates and charges imposed for the utility services furnished by it in Palm Beach County. The appli-cant was incorporated in 1959 for the purpose of buying existing water and sewer companies within the state, and, during that

year purchased the Seminole Manor Water and Sewer Companies. In 1960, it purchased the Lake Clarke Water Company and in each case took over the operations of the systems.

In June 1959, the Water and Sewer System Regulatory Law (now chapter 367, Florida Statutes) became effective, it having been passed by the Florida legislature during its 1959 session. In July, 1959, the board of county commissioners of Palm Beach County passed the necessary enabling resolution (see section 367.22, Florida Statutes) making this law applicable to water and sewer systems in that county and subjecting them to the jurisdiction of this commission. Approximately two years later these applications for rate increases were filed.

The law applicable to these applications contemplates that the utility should receive a fair return on the fair value of its property used and useful in the public service as determined by an engineer's appraisal as of the time the utility became subject to the Act plus the original cost of all net additions after such appraisal. This law has the effect of putting water and sewer utilities in a category entirely different from that of the other public utilities whose rates are fixed by this commission. As to the other utilities, the commission was given by the legislature a wider discretion as to the procedure to be followed in fixing rates.

Exercising this discretion within the limits defined by the law, the commission has through the years applied recognized public utility regulatory concepts which have been tested and approved in jurisdictions throughout the entire country. The basic principles underlying the rate-making procedures and theories applied and enforced by this commission have been approved by the Florida Supreme Court and the application of such principles has gained for this commission an enviable national reputation as a regulatory agency. The end result has been that the public utilities in Florida, which are subject to this commission's regulation, have enjoyed what has been termed a "favorable regulatory climate," conducive to the degree of expansion and improvement of service demanded by this rapidly growing state, while at the same time the public served by such utilities has enjoyed a good service at rates which have not by any measure increased to the extent that might be expected during periods of inflation and growth and have in some cases decreased.

With regard to water and sewer utilities, placed under the jurisdiction of the commission in 1959, the legislature has imposed restrictions upon the rate-making process which, though alleviated somewhat by the 1961 legislature, are still very severe.

When applied to the relatively new water and sewer utility industry that has sprung up during the last decade, these restrictions on the commission's discretion will give to these utilities an advantage to which they are not entitled, in some instances, at the expense of the rate payer. If the commission were not so directed by the legislature it could better balance the equities between the utility and its public and thereby avoid the precipitous and excessive rate increases that are being sought by the applicant in this case, as well as in others pending before the commission.

The inequities that will result from the application of the law in question find their basis in the historical development of the private water and sewer industry in Florida. Prior to 1950, almost without exception, water and sewer service was provided by governmental agencies. Thereafter, as the state's population increased at a great rate, a home-building boom ensued in parts of the state, resulting in the rapid development of vast residential subdivisions lying beyond the existing service facilities afforded by the various governmental entities. The rate of growth resulted in a need for expanded facilities in such a short period of time that private rather than public capital was needed. Such private capital has come largely from the subdivision developers who considered such expenditures as an element in their development costs. As corporations were formed to build and operate the systems some investment capital was added to varying degrees.

As the lots in the developments were sold, the services of the utilities were almost invariably offered to the buyers at noncompensatory rates which were generally comparable to the rates of adjoining municipally operated utilities which were often tax-subsidized government-operated utilities which have been in operation for many years.

The new law puts the commission in the unfortunate position of being the instrument through which the utilities now seek to put their operations on a profitable basis by requesting rate increases ranging from 30 to 100 percent or more over their current rates. Such drastic increases are virtually non-existent in the history of public utility regulation in Florida to this point. However, with the advent of this new law, lobbied through the legislature by the utilities which it regulates, it is relatively certain that the course of history in this regard will be altered.

Aside from the particular applications involved here, there has been only one earlier application for a rate increase under

this law. That was a case in which the commission attempted to avoid the restrictions imposed by the law and render a decision based purely on the fairness of the increased rates from the rate-paying public's point of view. The commission's order in that case has been reviewed by the Supreme Court and has been reversed in an opinion entered within the last weeks which directed the commission to comply with the requirements of the Water and Sewer System Regulatory Law. With that decision confronting the commission, the law must be applied as apparently intended by the legislature and as directed by the Supreme Court with the chips falling where they may. Although there is room for further debate over the interpretation of certain aspects of the law, it seems that the best way to remedy the situation is to apply the law as fairly as possible and let the results speak for themselves. In this way it is possible that public opinion may be voiced to the extent necessary to procure amendments to the law during the 1963 legislature that would result in these utilities having the same treatment as others regulated by the commission.

Throughout its presentation of its case and in its brief the applicant contended for an interpretation of certain aspects of the regulatory law that the commission cannot agree with entirely. Certain points have been conceded, however, with considerable reluctance. These points will first be discussed, pointing out all objections to the required procedures and their results. Then attention will be given to areas in which the commission's interpretation of the law requires a different treatment of certain accounts from that proposed by the applicants. Finally the figures regarding each system will be treated separately.

Section 367.14, Florida Statutes, in subsection (1), requires the commission in a rate proceeding to "determine just, reasonable, sufficient and compensatory rates . . . " and to fix them by order. Thus far the requirements of this law are not materially different from those which require the commission to fix the rates of other utilities subject to its authority. These other statutory requirements have allowed the commission a latitude which has been denied in this case by the language of subsection (7) of section 367.14 which requires that water and sewer utilities be allowed "a fair return on the fair value of the property of the public utility used and useful in the public service as evidenced by the engineering report required by section 367.12(2) and in all rate proceedings thereafter a fair return on the initial fair value of the property of the public utility used and useful in the public service together with the original cost of all net additions to such property thereafter."

In attempting to divine the legislative intent from this ambiguous statement and to comply with it in the establishment of just and reasonable rates, the commission has experienced problems of no mean concern. Its duty, however, is to resolve such problems in such a way that the rights of all concerned shall be protected. In so doing the commission undertakes to be guided by the declaration of intent found in section 367.22 to the effect that " . . . this law shall be deemed to be an exercise of the police power of the state for the protection of the public welfare and all the provisions of this law shall be liberally construed for the accomplishment of that purpose."

This law requires a most confusing application of two distinct methods of arriving at a rate base for rate making purposes. First, there is the "fair value as evidenced by the engineering report." Then there is the requirement that all additions after such report shall be considered on an "original cost" basis. (The latter is the basis customarily relied upon by this commission in fixing the rates of other utilities which it regulates). In treating the engineering report, or the fair value appraisal, as it is often termed, the commission has agreed with the applicant that certain deductions must be made and that some must not be made. It is believed that the legislature intended for this appraisal to be used as a starting point, but that does not preclude its being affected by reasonable adjustments.

The record as to each docket indicates that the appraisal of the plant and systems is unreasonably and illogically higher than what are estimated to be the original costs and that a portion of the appraised plant was donated free of charge or was purchased with funds made available by the developer of the residential properties in the form of contributions in aid of construction. Under the normal procedures followed by the commission these amounts would be deducted from the rate base and by so doing the utility would not be allowed to realize a return on such donated or contributed plant.

However, the law to be applied here contemplates a different treatment, and, accordingly, the commission has not made a deduction from the rate base established in each docket with respect to any plant or the funds therefor which were contributed prior to the date of the engineering appraisal. This means that in determining the rate base in each docket the point of beginning will be the appraised value of each plant without regard to the cost of it to the applicant's predecessor—that is, the companies which made the initial investments in the plants.

The commission has also agreed with the applicant on the handling of depreciation reserve and depreciation expense. In

this regard the plant in service as to each docket at the end of the test year has been adjusted by a deduction for accumulated depreciation. Also, in the treatment of depreciation expense, as a deduction from gross operating revenue, the commission has allowed the claimed deduction even though in both cases this has resulted in the allowance of depreciation on contributed plant with the result that the customer who paid for that part of the plant will over the years it is in use also pay for the replacement of it when it is retired.

Naturally, the commission has concurred with the applicant's treatment of a number of other matters, and in this regard is constrained to commend the applicant for a thoroughly and expertly prepared case. The points of agreement heretofore discussed are mentioned in particular only because they are different procedures which the commission believes the law involved here demands it to follow. They constitute departures from methods found in this and other jurisdictions to be sound and just and they are followed here with reluctance but with due regard to the powers that dictated them.

In the areas to be discussed hereafter the commission has taken issue with the applicant's contentions with regard to certain interpretations of the requirement of the law for reasons which it considers sufficient and which will be noted.

The applicant's engineering witness presented his appraisal which was conducted with reliance on the principle that "fair value" means reproduction cost new, less depreciation. This may well be an engineer's concept of the meaning of the term, but for rate-making purposes the commission is of the opinion that a different definition should be applied. There is also a divergence of opinion between the commission and the testifying engineer as to the meaning and application of the term "used and useful in the public service." For example, his testimony indicates that because a plant and system is being used, it is, therefore, used and useful. Such an understanding of the term completely disregards the fact the single word "used" would be sufficient by itself to convey that meaning.

Since the commission's opinion on the definitions discussed above does not coincide with that of the witness, the customary procedure might be expected to be that the commission staff would produce its own expert witness to advance his theories on the meaning of the disputed terms and to give evidence that would contradict the results produced by the applicant's witnesses through reliance on his definitions.

That was not done for several reasons. First, there was no appropriation of funds for hiring the additional engineering personnel the commission would need to make its own appraisal in accordance with its understanding of the law. Second, there is authority to support the proposition that a regulatory commission such as this need not accept expert testimony as to such matters as definitions of technical terms. And, finally, at least where the fair value of the plants and systems is concerned, the commission has in this record very substantial evidence on that score.

The engineering appraisal relied on by the applicant was conducted some time after the applicant had purchased the systems from their former owners. The purchase price in each case was substantially less than the value of the systems as evidenced by the engineers' appraisal. The exhibits submitted by the applicant with regard to each system contained references to an "acquisition adjustment" which the testimony shows to be the difference between the purchase price paid by the applicant and the appraisal value established by the engineer. In connection with such acquisition adjustment an "acquisition adjustment amortization reserve" has been established for the purpose of providing for the extinguishment of the amounts in the acquisition adjustment account. In dockets 6426-W and 6427-W, the applicant has received contributions in aid of construction since the date of the engineering report which were in excess of construction costs and has credited such excesses to the acquisition adjustment, thus over-stating that account.

The commission is of the opinion that such excesses should be included in the contributions account and treated as contributions in the manner hereinafter set forth. Thus the acquisition adjustment account should be debited by the amount of such excesses. It is also customary procedure to include acquisition adjustments in establishing a rate base. In this case there was no need for an acquisition adjustment at the time of the purchase of the systems and it came into being only after the applicant compared its acquisition cost with its engineer's appraisal and found the latter greater. As the law apparently intends that the engineering appraisal is only a point of beginning and that matters accruing thereafter should be treated according to traditional "original cost" procedures, the commission has concluded that this adjustment should be considered in arriving at a rate base for rate-making purposes.

When the law requires that the utility receive a return on the fair value of its property as evidenced by the engineering report, it does not contemplate that the value so established

shall be the rate base since it also contemplates that depreciation shall be taken into consideration as reserves for that are accumulated *after* the date of the fair value study. Hence, if adjustments of this kind are allowed, it must not have been intended that other adjustments common to original cost procedures applicable thereafter would not be allowed.

On the basis of the same reasoning, that original cost procedures are applicable after the date of the engineering study, the commission has applied its customary original cost concepts by excluding from the rate base in these cases all contributions in aid of construction received after the date of the appraisal. In this way the applicant is not allowed a return on the property represented by such contributions. This has the further laudable effect of sending the utility to the money markets for funds to be used in future expansion if it intends to make a return on such property additions.

As further justification for including the aforementioned acquisition adjustments in the rate base, thereby reducing it, the commission considers, as has already been mentioned, that the term "fair value" cannot properly be construed to mean "reproduction cost new less depreciation." Rather, in determining fair value, attention must be given to many evidences of value, not the least of which is original cost. Also, although market value and fair value may not be synonymous, the price paid for a property after arm's length negotiation is of inestimable value as evidence of the property's fair value.

Although the law may seem to indicate that the *only* "fair value" is that "evidenced by the engineering report," the commission takes the position, as already stated, that such report is only the starting point. Not only is the amount determined by it as the fair value subject to adjustment in arriving at a rate base, but other evidence of value must be considered. Otherwise, the report has no more value as evidence than any self serving testimony. It is apparent in these cases that the engineer gave little or no weight to the original cost of these plants or to the purchase price paid for them by the applicant only a short time before the study. The inclusion of the acquisition adjustment in the rate base, therefore, has the effect of bringing the engineer's estimate of fair value in line with the fact of fair value.

With an occasional minor exception the commission has not taken issue with any of the other figures employed by the applicant in making his case. Therefore, the commission's computation of the rate base and net operating income as to each system is set out hereafter.

### DOCKET No. 6426-W (LAKE CLARKE WATER SYSTEM)

| | |
|---|---:|
| Plant in Service | $165,580.89 |
| Acquisition Adjustment | (39,983.66) |
| Contributions Credited Acquisition Adjustment | 1,835.90 |
| Total Plant in Service | 127,433.13 |
| *Deductions:* | |
| Depreciation Reserve | 12,626.60 |
| Acquisition Adjustment Amortization Reserve | (791.64) |
| Customers Deposits | 2,150.00 |
| Total Deductions | $ 13,984.96 |
| Net | $113,448.17 |
| *Additions:* | |
| Cash Working Capital | $ 936.87 |
| Materials and Supplies | 767.22 |
| Total Additions | $ 1,704.09 |
| Rate Base | $115,152.26 |

The actual net operating income as calculated by the applicant for the test year, with which the commission takes no exception, is shown as $4,363.43. On the rate base as stated by the applicant such income produces a rate of return of 2.82%. On the rate base approved by the commission of $115,152.26, the rate of return is 3.79%.

The rates proposed to be effected by the applicant would on a pro-forma basis produce $11,310.03 annually or a return on the commission approved rate base of 9.82% which is excessive.

By calculations set out hereafter the commission has determined that a return of 6.20% would be fair and reasonable. The gross revenue increase needed to produce such a return is $3,312 as compared to the increase requested by the applicant of $9,432. The actual gross revenue for the test year being $15,434.10, the increase in rates allowed here amounts to 21.46%.

### DOCKET No. 6427-W (SEMINOLE MANOR WATER SYSTEM)

| | |
|---|---:|
| Plant in Service | $249,636.52 |
| Acquisition Adjustment | (6,736.29) |
| Contributions Credited to Acquisition Adjustment | 129.69 |
| Total Plant in Service | $243,029.92 |
| *Deductions:* | |
| Depreciation Reserve | $ 9,080.10 |
| Acquisition Adjustment Amortization Reserve | (344.32) |
| Customers' Deposits | 2,191.00 |
| Total Deductions | $ 10,926.78 |
| Net | $232,103.14 |

*Additions:*

| | |
|---|---|
| Cash Working Capital | $ 1,525.45 |
| Materials and Supplies | 1,142.85 |
| Total Additions | $ 2,668.30 |
| Rate Base | $234,771.44 |

The actual net operating income as calculated by the applicant for the test year, with which the commission takes no exception, is shown as $3,427.04. On the rate base as stated by the applicant such income produces a rate of return of 1.36%. On the rate base approved by the commission of $234,771.44, the rate of return is 1.46%.

The rates proposed to be effected by the applicant would, on a pro-forma basis, produce $12,778.43 annually or a return on the commission approved rate base of 5.44%.

In this docket the applicant seeks to increase rates so as to produce additional gross revenue in the amount of $9,670.70. By allowing this increase of 44.51% over present gross revenues the 6.20% hereafter calculated as fair and reasonable for the applicant company as a whole is not realized, but since the applicant seeks only this increase, it will be allowed.

### DOCKET No. 6428-S (SEMINOLE MANOR SEWER SYSTEM)

*Rate Base:*

| | |
|---|---|
| Plant in Service | $348,812.33 |
| Acquisition Adjustment | (174,263.61) |
| Total Plant in Service | $174,548.72 |

*Deductions:*

| | |
|---|---|
| Depreciation Reserve | $ 12,021.25 |
| Acquisition Adjustment Amortization Reserve | (5,653.68) |
| Customers' Deposits | 1,460.67 |
| Total Deductions | $ 7,828.24 |
| Net | $166,720.48 |

*Additions:*

| | |
|---|---|
| Cash Working Capital | $ 1,531.12 |
| Materials and Supplies | 1,104.57 |
| Total Additions | $ 2,635.69 |
| Rate Base | $169,356.17 |

This division is shown as operating at a net loss for the test year of $5,978.87. In this regard the commission accepts the applicant's figures. There is, therefore, no return being realized on this system.

The applicant seeks to increase its gross revenue for this system from $14,401.60, annually, to $41,640.00. This results in a net income of $17,201.85 or a rate of return on the commission approved rate base of 10.16% which is excessive.

From the calculations set out hereafter the commission has determined that a return of 6.20% is fair and reasonable. The gross revenue needed to produce such a return on this system is $31,920 which amounts to an increase in rates of 121.64% over present rates in order to produce an increase in gross revenue of $17,518.

### Rate of Return Calculation

Using year end figures the commission has calculated the cost of capital of this applicant, considering the company as a whole, at 6.20% as follows—

|  | Amount | % to Total | Cost | % Cost or Earned |
|---|---|---|---|---|
| Common Stock | $100,000.00 | 16.60 | $10,000.00 | 10.00 |
| Earned Surplus |  |  |  | 0 |
| Total Equity | $100,000.00 | 16.60 | $10,000.00 |  |
| Mortgage Notes | 485,000.00 | 80.51 | 26,675.00 | 5.50 |
| Customers' Deposits | 17,405.00 | 2.89 | 696.20 | 4.00 |
| Total Capital | $602,405.00 | 100.00 | $37,371.20 | 6.20 |

The applicant presented no evidence to support any particular return on its common equity, but, as seen above, the commission has calculated that a 10% return is equitable here. Traditionally, the risk factor in water and sewer companies is considered to be low. Also, the need for attracting additional capital in companies of this kind in Florida is greatly reduced by the fact that section 367.11, Florida Statutes, allows an almost unrestricted reliance on customer or developer contributions in aid of construction for expansion of distribution and collection systems.

With these factors being considered the commission has determined that in this case a rate of return which is sufficient to pay the cost of the applicant's capital will, when applied to the company's rate base produce reasonable, sufficient, and compensatory revenues particularly for an operation as new as this one with the growth potential which it has.

As has been noted the commission has allowed rate increases in the respective dockets of 21.46% 44.51%, and 121.64%. Only the 44.51% increase resulted in allowing the applicant the exact dollar return requested, the other increases being considerably less than requested. In all candor, the applicant itself must

admit that such increases are anything but fair and just from the point of view of its customers.

If business ethics and a due regard for good public relations, which should be expected in a high degree from those in public service industries, are exercised to any degree by the management of the applicant company, it is difficult to see how it could in good conscience take full advantage of the rights which this commission feels that it is here compelled to afford because of an unfortunate combination of facts favorable to the company and law unfavorable to the public.

Nevertheless, upon consideration of the facts herein adduced and the law applicable thereto, it is ordered that Florida Water Service, Inc. be and it is hereby authorized to file with the commission, within 30 days from the date hereof, for its subsequent approval, appropriate tariff provisions allowing it to increase its rates and charges for water and sewer service provided by its Lake Clarke and Seminole Manor divisions so as to produce with regard to each division dealt with herein gross revenue not in excess of the amounts hereinabove approved as being reasonable, sufficient and compensatory.